We have five cases before us for resolution this morning. One of them is a case that's been submitted on the briefs. We have four cases scheduled for oral argument this morning. Before we get started, the court has a little bit of business to handle. Mr. Weinberg, will you please stand? Don, you've been my law clerk for the past year, and I'm sure that you would say that it's gone by fast. That's because they say that when you work hard, time flies. You know, your excellent work product has been a testament to your work ethic, and you have done well in my chambers. You've brought honor to my chambers as well as to this honorable court. So I wish you the best in the future. I know that the man who stands in the will of this court will represent the profession well, will be an excellent lawyer and a leading light in the USIP profession. I move for admission of Jonathan Weinberg, who is a member of the bar and is in good standing with the highest court of California. I have knowledge of his credentials, and I am satisfied that he possesses the necessary qualifications. I now turn over the motion to Judge Chen, and he will preside over the motion. Thank you, Judge Reina. The motion is granted. The motion has been granted. Congratulations. Please raise your right hand and repeat after me. Do you solemnly swear that you will comport yourself to the attorney of the counsel of this court uprightly according to the law, and that you will support the Constitution of the United States of America? I do. Congratulations. You're welcome to come to the ceremony. Our first case this morning, and they're combined cases, is Apple Inc. versus Amaranth Inc., and Amaranth Inc. versus Agilisys, or Agilisystems Inc. I received from our clerk the times that the parties were chosen to argue. Let me make sure I got this right, okay? And you let me know if I don't have it right. Mr. Panikowski, you're going to argue first for 10 minutes. That is correct, Your Honor. Mr. Osborne, you're next for 17. Correct. Yes. Mr. Mattel, 10 minutes? Yes. 10 minutes. Mr. Franklin, 15. Correct. And Mr. Osborne, 8. Correct. Is that correct? Do us a favor. When you get up, just briefly tell us who you're representing again so that we want to make sure we've got everybody in proper order. So, with that, Mr. Panikowski, are you ready? Yes, Your Honor. You may proceed. Good morning, Your Honors. My name is Stanley Panikowski, and my colleague Jonathan Franklin and I will be arguing on behalf of all the petitioners in the three underlying CBM proceedings. Mr. Franklin plans to address all the claims that the Board correctly ruled to be patent ineligible across all three patents. I plan to address the instituted claims that the Board incorrectly declined to rule patent ineligible. These claims are Dependent Claims 3, 6-9, 11, and 13-16 of the 733 patent, dealing with additional limitations directed to linking orders to specific customers at a table, handwriting, and voice. Your Honors, these Dependent Claims are unpatentable as a matter of law under Section 101 because they fail to disclose any inventive concept that adds significantly more to the abstract idea that Amaranth has tried to monopolize. The Supreme Court's decision in Alice and this Court's decisions in cases like BuySafe, CyberSource, Intellectual Ventures, Internet Patents, OIP Technologies, Ultramersal, and Versata compel this result. The 733 patent itself confirms that none of the additional limitations of these Dependent Claims discloses an inventive concept, and the patent alone is enough. In fact, this Court has affirmed Section 101 unpatentability rulings, a motion to dismiss, and motions for judgment on the pleadings in BuySafe, Internet Patents, OIP Technologies, and Ultramersal. The patent supports a legal ruling of unpatentability in three ways. Any one of these three ways is enough by itself to reverse the Board's decision on these claims. First, Your Honors, the absence of any disclosure of an inventive concept renders these claims unpatentable. Under Step 2 of the Supreme Court's Alice test, after the Board has found that the claims are drawn to an abstract concept, the Board is required to conduct a, quote, search for an inventive concept, end quote, that adds significantly more to the abstract idea itself and is not just token post-solution activity. I guess you had the burden, right, the burden to show that these claims were unpatentable under Section 101. And the Board said that you didn't meet your burden of proof. You didn't marshal the evidence. Your analysis on these particular dependent claims was a little too conclusory, a little bit too much hand-waving. And so, therefore, at least with respect to these claims, unlike other claims, you didn't really marshal your case effectively enough. So what's wrong with what the Board said there? Your Honor, the Board's ruling on that point was incorrect for three reasons. First, petitioners did make their case and marshal their evidence on these claims. In the petition… Well, you were about to cite us to sections of the patent specification, right? But I don't believe you actually cited those certain passages of the patent spec to the Patent Board with respect to these particular claims. Is that correct? Your Honor, that is not correct because, for example, at pages A132 and 133 of the Joint Appendix, this is the petition for CBN review on the 733 patent. Petitioners are talking about the challenge claims, which are identified as Claims 1 to 16, and are talking about those challenge claims together, each and every one of them. And in that argument, the petitioners cited to several portions of the patent specification, most notably to column 6, line 48, to column 7, line 3, where the specification says that the invention employs typical hardware, that is, configured by unspecified application software, in order to implement the invention. Later on, and also cited at page A133, the patent says at column 12, lines 62 to 65, that for the software, the programming steps are commonly known, such that programming details are not necessary details. What about for the dependent claims? For example, the claims directed to voice attacks or directed to handwriting? Your Honor, this argument applies to the dependent claims because petitioners identified Claims 1 to 16, and those two citations from the specification are part of the detailed description of the invention, talking about the entire invention. The 733 patent is a continuation in part of the 850 patent, and there was some material that the applicants added to the summary of the invention in columns 3 and 4 in the continuation in part application. However, they did not add anything directed to these dependent claims to the detailed description of the invention. The specification talks about those things being conventional or well-known. Your Honor, the specification does talk about the hardware being typical and the software programming steps being commonly known, and those statements apply to the entire invention and all its claims. Those statements are not limited to the independent claims or any claims in particular, and in the petition at pages A132 and 133, the petitioners cited those portions of the specification for all the challenge claims. To what extent is it required, would you say, to offer or to submit extrinsic evidence addressing whether these claims are well-known in the art? Your Honor, in this case, it is not necessary to submit extrinsic evidence, and this Court has confirmed that in a whole host of cases, extrinsic evidence was not necessary. In fact, you can rule these claims… If you have a specification that says that elements of the claim were well-known or conventional, is that enough? Shouldn't there be some sort of offering of evidence to show that? No, Your Honor. Statements in the specification that technologies are well-known, routine, typical, or conventional have been held to be sufficient by this Court to render claims unpatentable under Section 101. For example, this Court has done that in Internet patents, OIP technologies, and cyber phone. In fact, Your Honors, this Court does not even require citations to particular passages of the specification. In Arioso, we found that the application steps were well-known and conventional, but there was evidence in the record that indicated that, outside of just something that the patentee says in the specification. Your Honor, in some cases, there is extrinsic evidence, and a petitioner can submit extrinsic evidence. The petitioners here submitted some extrinsic evidence as to manual modification. However, Your Honor, that extrinsic evidence is not even necessary here. All that's necessary here, Your Honor, even before we get to the specification, is the simple absence of the disclosure of an inventive concept. Under ALICE, once the petitioners raise the Section 101 argument and identify the challenge claims, the Board has a duty to search for and find an inventive concept if it's going to uphold the claims as patent eligible. Well, to be fair to the Board, to the decision-maker, it's not its duty. It's your duty to explain why there's no inventive concept. You're the one with the burden, and then if you don't meet your burden, then the claims survive under Section 101. Correct, Your Honor, and the petitioners met their burden here in multiple ways. And even if you were to limit petitioners on appeal to the precise argument, the precise words that we uttered at Joint Appendix Pages 132 and 133, referring to all of the challenge claims, including the dependent claims, and citing various portions of the specification, like Column 6, Lines 48 to 73, Lines 62 to 65 of Column 12, Your Honor, that is sufficient because in those portions of the specification, the applicants said you only need typical hardware to implement the invention. The software steps are so commonly known, and nowhere else in the patent, Your Honor, was any even putatively inventive concept disclosed. There was nothing disclosed that would, for example, improve the functioning of any of the technologies recited in these dependent limitations. All you have are claims that are saying, take this business process and apply it with a technology. So I guess your point is that when you read the specification, it's eminently clear that every single hardware component that it's discussing or referring to is something that was known in the art, and so now these claims are using these known components for a particular business process. Yes, Your Honor, that is clear from those passages of Columns 6, 7, and 12. It is also clear from Columns 3 and 4, but even if the court were to disregard Columns 3 and 4, Columns 6 and 12 are sufficient, and even if the court were to accept the board's incorrect refusal to recognize petitioner's argument based on Columns 6 and 12, the Supreme Court in Alice, as well as this court in Intellectual Ventures, Internet Patents, CyberSource, simply relied on the absence of any disclosure of an inventive concept for finding that certain things were not inventive. For example, Your Honors, and then I would like to reserve the rest of our time for Mr. Franklin's argument, in Intellectual Ventures, this court stated, nowhere does Intellectual Ventures assert that it invented an interactive interface that manages website content. In Internet Patents, Your Honor, the court said the mechanism for maintaining the state is not described, although this is stated to be the essential innovation. In this case, Your Honor, the petitioners did cite to various portions of the specification that amply show affirmatively that there's no inventive concept for these dependent limitations. However, even under the board's view, the Supreme Court in Alice has said once you find that the claims are drawn to an abstract idea, you must search for an inventive concept. And if you do not search for and find an inventive concept, then these dependent claims, like all the other claims that the board correctly ruled to be patent ineligible, should be held unpatentable under Section 101, and the judgment should be reversed with respect to those dependent claims.  Mr. Osborne? Please, the court. Yes, I'm John Osborne for Amaranth, Appley and Cross-Appellant, Appley on the issues Mr. Panikowski just discussed. So I'll start off with that case. Will you be not only defending the patentability of the claims the board concluded were patentable, but in these opening remarks will also be seeking reversal of the patent board on all the claims it did find unpatentable? Correct. I'll address the issues we addressed, and then I'll go directly to the other issues we appealed. If it please the court, in rebuttal to my friend Mr. Panikowski, he's relying on a general statement that known programming techniques makes everything disclosed as a function conventional. He's saying if someone just uses programming language that has been available to write their inventive software, that's conventional. But the inventors did not have to invent a new language in order for their new application software to be an invention. That's his basic argument. Let me ask you a question about the claims that the board concluded survived under Section 101. Amaranth isn't standing here arguing that it invented voice capture technology. Absolutely not. And it's also not standing here arguing that it invented handwriting capture technology, right? Absolutely not. And it was known to use those technologies as ways of entering data into a computer system. Correct. So what you're arguing is the inventive concept is using that known established technology of entering data into a computer system, handwriting capture, voice recognition capture, for purposes of ordering food over a computer network system. No, I would disagree with that characterization. What we're saying is that the manual modification was to a menu that had been generated from a first menu, a back office menu, if you will, for a specialized display device, a handheld device or a web page. It was generated for that. It was transmitted to that. And then it was modified by manual modification. Thus, all of the couplings between the multilevels of the menus had to be addressed in the manual modification. So it's not simply putting some data into a form or recognizing a character or a voice input and doing something. It's going to that specific menu. All those other elements about generating a second menu from said first menu at the back office server and everything else that comes with that, those were all recited in claims that the patent board found there to be lacking in inventive concept. So for the particular dependent claims where the patent board went the other way and said these claims are okay under 101, the unique aspect about those claims was the fact that there was this voice recognition capture or this handwriting capture technology that would be used to enter in these custom orders. And that was necessarily what must have been the inventive concept. I'm just trying to draw a straight line through the patent board's thinking. They found all the other elements that lack inventive concept. But for these dependent claims, the inventive concept necessarily must have rested on the usage of voice capture technology or handwriting technology to capture the order. But even given what the board decided as the other elements of the claims, the board still characterized the claim subject matter as menus having handwriting capture or voice capture functionality. The board did not hold that mere use of voice capture or handwriting technology was the inventive feature. The board said menus having that capability. So the board drew a distinction. It has a basis for making its decision independent of their characterization that it was just handwriting or voice recognition. That's not what it was. Was there something about the menus that made it so that the voice to text or handwriting had to be modified in some way to work with these menus? Something about the menus in the sense that the menu may not have had something that a customer wanted. So the menu is modified in the sense that the waiter or a customer out at a remote, using a remote iPhone or whatever, could enter in something that is not in the menu that was transmitted to them in the first place. And it would go back for fulfillment. Was there something about the menus themselves that made it so technically there had to be some sort of modification to the voice data or the handwriting software? It was the fact that the menus were complicated structures. They were structures that included multiple levels of categories, items, modifiers, and submodifiers. And to provide for manual modification functionality in that context required functionality that was specific to the menus that had been generated. Functionality that was different? And where is that disclosed in your patent? It's discussed as, I mean, that specific statement I'm characterizing what the specification overall describes. What's the functionality in that situation? The handwriting? The functionality is computer software system that recognizes handwriting, converts it into an input that is effectively a menu item or modifier or submodifier. Right, but I see in your 733 patent you have a figure 8 where I guess there's a little screen here on the handheld device where someone can just write in with lemon when someone orders iced tea but they want a lemon. So I guess the waiter or waitress would then scroll in on the screen with lemon. Yes. But that concept, I don't want to call it inventive concept yet, but that concept of entering data in on a screen through handwriting, that's something that was already known and established. Yes, but that's not the plain concept. The concept is doing it in the context of these very complicated multi-level menus. At the end of the day, aren't you just left with a modified menu? You've changed one menu to another? Yes. Yes, but still the court found menus having manual modification functionality to be an inventive feature, which was not, no evidence was provided otherwise by them. I'll make a brief mention about the 496 patent that they disclosed. That was just a medical record form. It wasn't making any change to a menu. It wasn't making any change to a second menu that had been generated from a first menu. We're now talking about the dependent claim about linking a customer to a customer's own order. No, I'm talking about handwriting and voice recognition. Oh, Rebecca, okay. I think what the board said on linking was correct. But, I mean, Amaranth is not standing here contending that it was the first one to link a customer in a restaurant to that customer's order to make sure that the right customer got the order of food, right? In the context of these generated menus, yes. In the context of the particular menu. As a general matter, though, that had been done a long, long time. Somebody had kept track with a customer's order, yes. These are computerized menus. These are not claims directed to a method of keeping track of orders in a restaurant. It's a computerized system. There's a lot in there, and this is on top of it. Here's what I'm wrestling with. If, hypothetically, I agree with the patent board that for the independent claims and all of the elements residing in the independent claims are really nothing more than a business concept being run on a computer network and, therefore, it's essentially an ineligible abstract idea, I don't see at the moment how a dependent claim that adds the additional limitation of linking on the network the customer's order to a particular customer at a location in the restaurant as being now something that's a sufficient inventive concept above and beyond the ineligible concept running on a computer network from the independent claim. Well, I understand that, and we disagree with the board's primary decisions in any event. But even if those are right, the board has decided, based on the evidence it reviewed, that these did add additional functionality that distinguished over its decisions, and we think the board stood deference for that decision based on what we said in the briefs. Are you saying that you would agree that the claims really should stand or fall together? No. If you're right... No, I said the opposite of that. Okay. I meant to. Yeah, yeah. No, they should not stand or fall together. The board considered the arguments and the lack of evidence that the appellant submitted as petitioner and decided that there was insufficient evidence to find conventionality of all of the claims that it confirmed. You argue that the lack of evidence that the board found is a factual finding, correct? That's true. And why are you making that argument? You're saying that changes are standard to review with respect to that finding? Well, they're due deference because no evidence was presented, but independently we explained in our briefs how they did not, how Mr. Panikowsky did not make any, or below, the PTAB did not make proper arguments to support rejection of those claims. There's nothing on the record to support it, as the board said. Well, if it's apparent on the intrinsic record, then there's no need for any additional evidence. Well, they argue it's intrinsic, and they also argue, they didn't say it today, but they pointed to this extrinsic evidence, which they didn't properly state below, but they tried to argue it on appeal, and we explained in our brief how they failed on that argument. They did cite portions, and Mr. Panikowsky pointed those out to us, in the record where they were pointing to portions of the specification, which made it pretty clear that the invention was conducting this process of generating menus and transmitting menus and then getting orders, but using all pre-existing known technologies. I disagree. Okay, then what are, what would say be the hardware components? We're not claiming we invented hardware components that were novel. We claim we invented application software that is reflected in Element G of A50 Claim 1, which reflects that four-level menus, multiple-level menus, are generated from a first menu for a display device and transmitted to that device for display. These menus use parameters, including modifiers and submodifiers. It's a complicated structure. It's transformed into a menu suitable for, for instance, a small-screen handheld display. That's one of the recited target devices. Prior to the invention, a menu on a handheld device was entirely separate from a menu in a back office. The screens were different sizes, like a PC versus a handheld device. All of the linkages between the various levels had to be maintained, even though the screen was being, the screen was very much smaller. It wasn't a matter of just reducing the size, just making a one to three reduction or whatever. You had to keep all the linkages straight when you changed where things appeared in the sequence. I know you argued that one of the core, maybe the core moment of your claimed invention is being able to take a lot of information about what could be on a menu and reducing it down to something that can be seen and operated with on a small handheld device. That's right. Where in the claim does it really actually say that? That now what my invention is, is somehow now being able to do this on a handheld device that otherwise could not be done. The claim recites four levels. Categories, items, modifiers, and submodifiers. Modifiers and submodifiers are selected from a parameters list at the end of the where in clause in the claim. The claim says this second menu is going to be generated from selecting things from the first menu, from the modifier menu, and the submodifier menu. But the claim doesn't go further and then describe how this is actually hard to do and what we do now that's so interesting to manipulate all that data so that it can be easily seen and worked with on a small handheld device. As we have detailed in our briefing, the specification supports reading that claim terminology as transforming to something for a specialized display. The board actually agreed with us on this. The board said that a web page is displayable in a browser. Menu has to be turned into a web page as well. And that a menu is displayable on a computer display. So that means there's a display requirement in these claims. Plus, the preamble recites a synchronous communication system. That has to be interpreted as a bidirectional system. Synchronous is me talking to you. If you ask a question, you expect a response. This is a synchronous communication system. That's what the claims are referring to. The full disclosure in the summary of the invention and specification describes the present invention in the summary of the invention. But just to confirm, the practice of data syncing by the time this patent application was filed was something that was already known and established on computer networks, right? Yes. You didn't invent the ability for updating data on one device and then that data getting automatically developed or updated at other devices. No, but we invented transforming a back office menu into a specialized menu for a different nonstandard display device. That's why we think they have proposed the wrong construction for CPU. The board got that wrong. The board got the preamble construction wrong. The board got the interpretation of menu wrong. All those together missed the entire inventive concept. If I could move on, I used most of my time here for this one. With regard to standing, there's a huge standing problem here. Because the board defined the abstract idea as generating a menu. And then the board changed the definition of abstract idea to generating a menu, generating a second menu from the first menu and sending it to another location. We didn't hear about the revised definition until the final decision. We were not given notice. It was a clear violation of the APA. There was no technological invention. The only evidence put forth by the other side for no technological invention was citing to an examiner's statement that had to do with claims that were abandoned and never allowed, not the claims on appeal entirely irrelevant. There was no evidence of technological invention. But this standing issue is a predicate disqualifier for everything on all of these appeals because we did not have an opportunity to address the abstract idea definition that they put forth. They actually agreed with us that generating menus was not the abstract idea. And by incorporating what we said, part of what we said was significantly more the inventive concept into their abstract idea definition and sprung that on us in the final decision. After the oral argument, after every opportunity for us to address that issue. So the institution decision said the abstract idea was generating and transmitting menus? Is that right? No. The institution decision said generating menus. That's what Mr. Panikowski's side, Mr. Franklin's side argued, that it was generating menus. The board agreed with us. You're right, patent owner. But maybe one institution decision on one of the patents said generating and transmitting menus and then the institution decision on a couple of the other patents. Well, it was a little bit different. I'm talking about the 850 and 325. It was a little bit different for 733, but the effect was the same. And I don't have a lot of time to get into all those differences. But they changed the definition. They changed the grounds. We are entitled to notice of the grounds we have to respond to. And it's the same as the case, I think it was the Genzyme case yesterday that you heard Judge Ring. It was an obvious miscontext. But this is even worse because there the argument was whether references or interpretation of references had been disclosed in the grounds. Here, unless you allow the board to say the grounds is 101, they can do anything they want. If they are not required. I think Judge Stoll has a question. I think I'm over here, so I'll reserve. You're three minutes over your time, but we let you go over your time, so that's okay. We'll add some more time to some of the others. Okay, I appreciate it. I'll address my other points on rebuttal. Mr. Mattel? Is it Mattel? Mattel? Thank you. Ten minutes. Your Honor, may it please the court. I'd like to begin by addressing the claims that the board found unpatentable, and in particular respond to Amaranth's arguments on those points. Amaranth essentially argues in its brief and its oral argument before this court that its claims have an inherent displayability argument, that that's implicit in the claims. All that the claims require, though, is synchronization between the devices, and the specification also limits itself to discussing synchronization. The prior art in this case, the Windows CE operating system, also in Amaranth's own characterization and its specification, provides synchronization. When we're talking about synchronization right now, which claims are we talking about? My understanding was the patent board found the synchronous element to not really be part of the claim because it was in the preamble. At least that's true for, say, claim one of the 733 patent. The board found that it's unnecessary to look to the preamble, that the preamble doesn't read in because synchronization is stated in the body of the claims as well. So there's no need to look to... Claim one of the 733? I thought that was other claims. There are claims which talk about data syncing in the body, but then there are other claims that don't, but then refer to it in the preamble. I thought that was what the patent owner was contesting, that for those claims where the notion of data syncing was only in the preamble, the patent board incorrectly excluded from consideration of the claims the element of data syncing. The board's conclusion was that synchronization is required for all the claims. To the extent that it didn't rely on the preamble in some of the cases, it made clear that it didn't rely on that preamble because the body of the claim states the complete invention and the preamble simply wouldn't add anything. But the board did agree that synchronization is required in all of the claims. The challenged distinction that Amaranth seeks to draw is this additional requirement of displayability, that synchronization also requires the ability to actually review this menu on a device. None of its claims, though, actually expressly state a displayability argument. Amaranth instead argues that displayability is implied in the synchronization. The difficulty with this argument is, again, not only is displayability not separately stated, but to the extent that displayability is implied through the claims requirement of synchronization, it's also inherent in the prior art's disclosure of synchronization. When the claims and the specification require synchronization, and the prior art also disclosed the synchronization, there's a match, and to the extent that displayability is a proper characterization of what's required by synchronization, it's also attached to the prior art. The bottom line is there's no getting away for prior art that describes the exact same thing. I thought their displayability argument was more than just the question of data syncing, but it was also the achievement of being able to display all this information on a very small handheld device, and that is what was so interesting about the invention. So, what do you have to say about that particular argument? They do contend that the invention effectively requires the information to be reviewable, which makes sense. Obviously, the invention couldn't function if the waiter or whoever is in the kitchen couldn't see the information. But, again, the question is how you get to the displayability requirement. Nothing in the claims expressly states the displayability argument. Before the board, Amaranth simply argued that it's implicit in synchronization. But, again, if it's implicit in the claims statement of synchronization, it's also inherent in the prior art's disclosure of synchronization. If you think about it, the Windows CE operating system, if it's promising, the specification's characterization of Windows CE is that it provides, I'm quoting, built-in synchronization between handheld devices, the internet, and desktop infrastructure. For that system to operate, for it to really provide the synchronization to the handheld device, the information also must be viewable on a handheld device. The same specification discloses that Windows CE provides on these handheld devices a graphical user interface that allows data to be manipulated like physical objects, that allows files to be created, deleted, modified in a drag-and-drop fashion. Windows CE provides all of the functionality that's recited in the claims and that's asserted to provide an inventive concept that would survive step two of the ALICE test. The specification talks about all kinds of different technologies that it is using in order to achieve its desired results, including the usage of handwriting capture technology and voice capture technology. Do you agree that those were known conventional things just based on the plain reading of the patent specification? Not in light of the patent specification, but I'll concede that this issue has evolved considerably over the course of this morning. The board's only basis for determining that the petitioner's burden hadn't been met with respect to those dependent claims was only those additional limitations added by the dependent claims. The board's underlying finding was that the synchronization and hierarchical menus, all of that was conventional in view of the prior art, in view of the patent statements. What the board found is that petitioners simply failed to meet its burden of presenting evidence that those additional limitations, the voice conversion to text, for example, had been shown to be conventional. In the course of this morning, though, it's been conceded by the patent owner that that technology was preexisting, that it was conventional. On review and IPR, this court's review is created by Section 319 of the Patent Act. This court sits as an appellate panel. It's charged with reviewing the correctness of the board's decision in light of the evidence that was before the board. It's the office's position that the board's decision was correct in light of the evidence before it because the petitioner simply hadn't presented any evidence, no analysis, no argument, nothing, that technology such as voice conversion to text was well-known and conventional at the time. You don't think a plain reading of the patent spec, just reading the four corners, is sufficient evidence to support the conclusion that what these inventors were doing was just taking off-the-shelf voice-to-text conversion technology and using it for its purposes for amending orders in a restaurant? No, I don't, Your Honor, for several reasons. Column 4? When the patent describes, for example, voice-to-text conversion technology or handwriting capture, it doesn't describe it as something that Windows CE provides, for example. It simply describes it as something that the invention does, and it's simply silent as to where that technology comes from, whether it's conventional or whether it's something that's been invented. But more fundamentally, to the extent that the petitioner... I guess you're saying the board, when it was reading Column 4, it could not tell whether perhaps Tamarant was the first one to invent voice-to-text conversion. And more fundamentally, Your Honor, the board's attention was never directed... The answer is yes to my question? The answer is the board simply didn't answer the question because that question was never posed to the board. That particular column, that type of evidence, the other patents now cited on appeal, were never cited to the board in the proceeding below. The entirety of the petitioner's argument with respect to these dependent claims is presented on the very last page of their brief, and it consists of two sentences, a conclusory statement that it's post-solution token technology without any analysis of the actual technology or matching it to the claim limitations, and then a statement that the technology could all be done in your head, that it could be done by hand without a computer. That goes to whether the invention is abstract, and we agree with petitioners that the invention is abstract, but Alice involves two steps. After you show it's abstract, you also have to demonstrate that that technology is conventional. Now, in some cases, I'll concede that this court and the Supreme Court has taken judicial notice of the fact that certain computer technology is conventional, and Alice, even the U.S. Supreme Court, was willing to say the computer is conventional. In other cases, this court has gone a little farther in the intellectual ventures case that said that a web browser is conventional technology. The additional limitations here, though, involve things such as voice conversion to text, speaking into a device, and that device automatically and electronically converting that voice into electronic text. That technology was new at some point during my lifetime. If this court is completely confident that the priority date of these patents is 1999, if this court is convinced that the conventionality of that technology was perfectly apparent at that day just as much as a computer was, it could reach the issues to a sponte, Obviously, the more you get into the technology, the more difficult these questions get, and the more that the petitioner has a burden of providing some basis to show that it's not just a computer, it's not just a browser or the Internet. There are additional elements here, and at what point in time did that technology become commercially available and conventional? Again, the fundamental issue, though, is Section 326E of the Patent Act. That places the burden on the petitioner to show this case. What about the evidence that the patent owner was relying on about all the great praise it was receiving for its technology of being able to do these kinds of orders? It's not clear to me the Patent Board was really using it or relying on it. That type of evidence was presented in the patent owner's response with respect to some of these dependent claims. The argument about secondary considerations about praise is reprised in this court only with respect to the Board's institution decision, and that institution decision, the office's position, is unrevealable under the Hineker Doctrine in this case. In In re Hineker, in the context of re-examination, this court held that when a particular argument is presented... No, we know Hineker. The question is what is, you know, you, the agency, the decision-maker, supposed to do with this kind of evidence in trying to determine whether or not there's an event of concept or whether this invention is inherently technological? What are you supposed to do with it? You know, if that evidence had been presented with respect to the Alice Step 2 determination, it could have been the office's position that for that evidence to carry weight, a nexus has to be identified with elements of the claimed invention. A nexus to what, though? And the commercial appeal or the praise or the unexpected success. In this particular case, the argument is only, again, presented with respect to an issue that's unreviewable, and on top of that, the argument doesn't... What I'm wondering is, is it a nexus to something that could be regarded as a technological advance, or is it merits to, say, the novelty of a business process that happens to be running on the Internet? In this case, I can't tell you, Your Honor, because when the argument is presented by Amaranth, they don't cite any aspect of the invention. They don't make clear whether it's the abstract idea that's novel or whether it's the computer implementation that earned all of this praise. Because no element of the invention is identified, there can't be a nexus to nothing. If no particular element of the invention is cited as generating that praise, then there's no basis for finding secondary considerations, Tell us again why we can't review this issue. Because Amaranth challenges the Board's 101, Step 2 of Alice's Determination, on four separate grounds, on the basis of synchronization, manual modification, hierarchical menus, and one other ground, and then it reprises those same four arguments and tries to repackage them as part of the challenge to institution. This it cannot do under this Court's decision in In re Hineker. In re Hineker... What if we don't agree with your Hineker argument? I mean, we do have the jurisdiction under Brasada. We are able to look and see whether the Board had jurisdiction over whether this was in fact a CDM, right? Yes, Section 324E of the Patent Act, which otherwise bars some review of institution decisions of PGR proceedings, was construed by this Court in Brasada not to stand as a barrier to review. In re Hineker, though, is a doctrine that provides an independent barrier to review of some decisions when those decisions are reviewed again on the Court's final decision. But if the decision is whether or not this is a technological invention, and then they're coming forward with, you know, if you want to call it secondary consideration but not an obvious fine, but nevertheless they're coming forward with some kind of extrinsic evidence to try to point out that this is in fact a technological invention, then don't we need to review that issue under Brasada? The 324E isn't a barrier to this Court's review, but Hineker should be. Hineker tells you when it's the same. Well, do you agree that under Brasada, we have jurisdiction to review whether the Patent Board was correct in concluding that these claims are not directed to a technological invention? Brasada forms no barrier, but Brasada, again, was directed solely to the proper construction of Section 324E. Hineker derives from the re-exam context. In the re-exam context, it's clear, for example, that there was no independent... This is like Brasada and Blue Calypso hold that we are supposed to determine whether or not it was correct for the Patent Board in an institution decision to conclude that an invention was not technological for purposes of instituting a covered business method patent. You agree with me, right? Yes, Your Honor. These are all CBMs. Yes. Again, I'd simply emphasize that Hineker was a prudential doctrine that isn't based on a particular review bar in the re-exam statute. It's instead implied from the structure of the proceeding. It appears to be a prudential doctrine created by this Court to insulate itself from the burden of essentially re-litigating the same question twice. If we don't agree with you on Hineker, my question is, what is your response then to the argument that the Board erred by failing to consider secondary considerations? Do you have a response beyond Hineker? The secondary considerations, just on the merits, because no particular element of the invention is cited in relation to the secondary considerations, there's no nexus. Under this Court's case law, there always has to be some nexus shown to some specific feature of the invention. For all we know, the praise could have derived from the abstract idea that's embodied in the claims and not from the technology. As I read the Board's institution decision, it appears to have looked at two different prongs. Do both of them rely on obviousness, or does just one of them rely on obviousness? I'm sorry, Your Honor. In the Board's institution decision, where it defined what a CBM, based on the PTO's regulations, it relied on two prongs. It said there were two prongs. One was, I think, whether there was a technological innovation that was novel and non-obvious, and one of them was whether there was a technical solution to a technical problem. So my question is kind of a softball, which is that, did both of those prongs rely on obviousness when you look at the Board's decision? No, it's really that first prong from the regulations that basically tracks the obviousness inquiry and also basically tracks the Step 2 of the ALICE inquiry. Obviously, there's a bit of overlap between Step 2 of ALICE and an obviousness analysis. The Director's position is simply, in a 103-101 case, you're already going to be forced to review substantially the same question twice, and Hinoch or Shield discord from the burden of reviewing the same question a third time under a deferential review standard. Ultimately, to the extent this Court concludes that Hinoch or isn't a bar and that decisions should be reviewed, all of the reasons why this isn't a technological, I mean, all of the reasons why Step 2 of ALICE hasn't been met with respect to these claims also applies to the technological invention inquiry, which is reviewed under a deferential review standard. I think we have that, Mr. Franklin. Mr. Franklin? Thank you, Your Honors, and may it please the Court, Jonathan Franklin also representing all of the parties that were petitioners in the proceedings below. I'd like to be primarily responsive here on both points, responding on both the dependent claims that the Board erroneously left in, as well as all of the other claims that, in our opinion, the Board correctly invalidated. As to the first, I think the brief response to that is that we did hear from the Council an argument that they did not invent the things that the Board said ultimately were the innovative concepts that sustained these patents. And I'm sure the Court is aware, but in its decision, which I believe was authored by Judge Tannen in content extraction, the Court specifically relied on a concession at oral argument about scanning technology and, in that case, text recognition technology being conventional. We don't think that the Court needs to do that, but if the Court has any concern about that, I think that concession has now removed that issue at once. Where's the concession? I'm sorry? Where is it? I'm saying the concession that I heard at oral argument from my colleague over here. But I don't think that we need to. I think that, fundamentally, we did present the argument to the Board that all of the claims were invalid, and they were all invalid because they only had an abstract idea. It was implemented through conventional technology. At that point, we presented the issue, and the Board had the obligation to find an inventive concept. Moving beyond that, I think I've heard a lot from Amaranth Council about how they use the term complicated structures many different times. These structures are not complicated, and the Board found them not to be complicated because the patent itself says they're not. The patent says that hierarchical menus were well-known in the art. It also says that every other of the features that Amaranth now claims is its inventive concept were, in fact, well-known in the art. That would include not only the hierarchical menus, but the synchronicity component, which is in a couple of the claims, Judge Chen, of the 733 patent. But otherwise, it's just in the preamble. But in any event, the Board looked at that and said that synchronization, as the patent itself says, and I think as Mr. McCollough said as well, synchronization is a built-in component of Windows CE. Windows CE applies specifically to mobile devices. So they did not invent that either, nor did they invent the displayability on nonstandard devices, which is not, again, an element of the claims. But in any event, that's also an element of Windows CE. I also heard from Amaranth Council that this was invented because they had some sort of novel software that they claim now, but that's not claimed in the patent. In fact, the patent claims the opposite. All of them say not only is the computer language known, but the discrete programming steps are commonly known and therefore did not need to be specified in the written description. So again, we have no innovative concept in the software. What we're left with, as the Board probably found, is an abstract idea, simply the generation and transmission of computer menus, or even in hierarchical state, combined with the implementation of that method using routine, ordinary, conventional computer technology. How do you respond to the argument from Amaranth that the abstract idea itself, how the Board was defining that, changed in the final decision, from the institution decision, and therefore there should be a revamp? I think it's more of a clarification than a change. In the original, they talked about generating menus, and then they talked about generating and transmitting them, whether that would be because they're generated on two different devices. But even putting that to one side, there was no prejudice to Amaranth. The Court reviews the final decision, and it reviews it de novo. So this Court reviews all of the determinations de novo. Amaranth's apparent complaint is that they didn't have the opportunity to present some sort of an innovative concept in response to the Board's characterization of the abstract idea. But they did. They presented all of the components that they claimed to be innovative, including the communication, the downloading, the synchronization, the transmitting from one device to the other that the Board included in the abstract idea. So Amaranth said, we think this is our inventive concept, and the Board rejected that. And you can find that at pages 21 to 22 of the appendix. I believe that's in the 733 case. And what the Board said in that passage is they said that this idea of transmitting to another device is simply routine, conventional activity. So it didn't add anything to the abstract idea, and the Board found that. So I'm looking at pages 21 to 22 of the 850 appendix, and that would be 28 to 29 of the 733. And what they say is that the specification discloses that the menu is transmitted to the wireless handheld device and web page by downloading. Such downloading is merely a conventional post-solution activity. Conventional post-solution activity is not sufficient to transform the abstract idea into patent-eligible subject matter. So the Board didn't say, just because we had defined it as part of our abstract idea, we're not going to consider the Amaranth's arguments on that. They did consider Amaranth's arguments, and they rejected them on the ground, that it is simply insignificant conventional post-solution activity. I'd like to briefly address, if I might, the colloquy that occurred on the secondary considerations evidence, and I think I want to follow up on some things that Judge Stoll said. Yes, you're correct, Your Honor, that the Board's regulations dealing with the technological invention prong have multiple parts to them. And in Versada, the Court found the part that dealt with novel and non-obvious technology, that that was essentially useless. I don't think the Court might have used some word to that effect in Versada, saying that it's essentially an issue that might occur on the merits were those to be in the case. The technological invention inquiry does not depend on an obviousness analysis with secondary considerations. What it depends on, as the Court found in Versada, is whether there's a technical solution to a technical problem, and that requires more than just a computer. Mind you, almost every, if not every, CBM-eligible patent is going to have a computer in it. These are covered business methods. They have computers. Versada says that's not enough. If the computer's in it, it has to be a computer using non-conventional computer technology that would take it out of the CBM review. So if it only uses conventional technology, that is not a technical solution to a technical problem. That was held in Versada, and that's what the Board held in this case. The Board correctly determined that this was not a technical solution to a technical problem. What would be examples of non-conventional computer technology? If you invented some sort of, you know, as you're colloquy, I think, with the Council, you know, if you invented the voice recognition technology and that was viewed as your inventive concept, that would be non-conventional. I think that... So that's the standard now for Section 101 for computer-related inventions? You have to invent computer technology? It's not. The standard is that if you're simply implementing the abstract idea on a computer using conventional computer technology, that isn't enough. And that is Alice. That's ultra-mercial. That's content extraction. That's OIP. That's... I mean, there's a... I think Your Honor is well aware of all the precedents. I mean, you know, certainly there could be exceptions where what you invented, what was truly your inventive concept might not necessarily involve technology, and we don't have that case before us. But we're talking about right now the technological invention component of the instituting order threshold issue, which I do agree, frankly, that it is redeemable under Versada, that issue. But that issue really depends on whether there's a technological invention. So whether or not their method itself was novel or non-obvious, that's not relevant. And the PTO's regulations make that absolutely clear. It's 77 Fed Reg, page 48764. The PTO regulations provide that reciting the use of known prior art technology to accomplish a process or method is not a technological invention, even if that process or method is itself novel and non-obvious. And that makes sense because we're talking about technological inventions here. We're not talking about an invention which is, for example, maybe a new abstract idea that you're recognizing. That's not going to be enough to take the patent out of CBM review. Once it's in the review, ultimately in this case, I think, frankly, as in Versada, the technological invention inquiry essentially merges into the Section 101 inquiry, the second step of it, because you're looking for an inventive concept here. And again, nothing in the patent discloses an inventive concept on any of the claims. And I think we agree with, I agree with most of what Mr. Mittal said, defending the board's reasoning, and that is that there is nothing inventive here. It is simply an abstract idea that is implemented using what the patent itself describes as conventional computer technology. What about generating a second menu by transforming data that resides in multiple other hierarchical menu structures? Well, the transformation of data, and Ultramershal makes this clear as well as some other cases, that isn't itself, that does not allow for a finding of validity under Section 101. All you're doing is merely transmitting data. But the board looked at all of that and said hierarchical menus are, in fact, routine. And they also said that altering the menus themselves is also something that was routine. Because the patent itself describes the technology for, says that the common operating systems are used to delete things from menus and add things to menus. Here we're looking at something more than just transferring data, correct? I mean, it's transferring data and that results in a new modified menu or a different menu. Well, you're transmitting the modified menu, I believe. So you've modified it by essentially you're taking categories and data. But it results in a different menu. Yes, but that's not the kind of transformation that would, for example, pass the machine or transformation test. Alice makes that clear. The court's precedents are clear that just simply transforming data from one form into another doesn't meet the transformation test. So what you're left with, again, is simply an abstract idea implemented through conventional technology. That's not enough. And the board was correct in this. The board found that that wasn't enough. And all we're saying here is take that and apply it to all the claims because none of the claims involve anything other than conventional computer technology. So your definition of the abstract idea here? We'll accept the board's definition of generating and transmitting menus as the abstract idea. Well, what about what it rested on in the final written decision? Generating a second menu from a first menu and transmitting the second menu to a different location. Yeah, I believe that when it came to defining the abstract idea, yes, it's generating a second menu from a first menu and sending the second menu to another location. Excuse me, that's the precise definition. It's a little more elaborate. It is, and I apologize for that. I would note, though, actually, if you look at some of the court's opinions, you'll see the abstract idea defined at slightly different levels of generality, even in the same opinion. I was looking at the Internet Patents case, and it describes it as a couple of different ways in that opinion. But, yes, we'll accept that specific abstract idea that the board identified, and that there's nothing— Which one, the first one or the second one? Generating a second menu from a first menu and sending the second menu to another location. That's what was in the final decision. Well, what if we think that that shoveled in too many details into the description of the abstract idea? Then what do we do? Well, this court has de novo review here, and even in the CBM proceeding, and that was said in Versada, that the review of this court is de novo. And this is a question of law. So the court can review de novo the question of law and decide whether or not there is, in fact, an inventive concept here beyond an abstract idea. So I think the court, again, looking at the Internet Patents case, the court described the abstract idea slightly differently in different— Page 1348 of that opinion, it talks about the abstract ideas retaining information in the navigation of online forms. And then later in the same page, the court describes the abstract idea as avoiding loss of data. So the fact that it's described at different levels of generality doesn't affect the legal question that the court needs to analyze, which is, in essence, have they added an inventive concept that goes beyond something that is an abstract idea? When the board, or maybe even a district court, determines that a particular claim element was well-known conventional technology, and therefore the claim is just resting on performing an abstract process on known conventional technologies, is that a fact-finding or is that a legal question, whether a particular claim element citing some form of technology is conventional, well-known, and established? I view it as a legal question, Your Honor, and I think that's how the courts have reviewed it. Otherwise, it could not have resolved, as Mr. Panikowski said, so many cases on motions to dismiss and motions for judgment on the pleadings. It's a legal question, and the question is, looking at the patent, which is not extrinsic evidence, looking at the patent, is there an inventive concept disclosed here? And there is no inventive concept disclosed in this patent. They don't purport to have invented any of the things that they claim are their inventive concepts. Ultimately, what we're left with is the abstract idea implemented under routine technology, and that, we know from all of the precedents, is not enough under Section 101. So we would ask the court to reverse the allowance of the dependent claim to issue in 15-1703 appeal and affirm all of the other determinations of the board. Thank you. Thank you, Mr. Franklin. Mr. Osborne, eight minutes, but you can go over. You have some additional time. I'll grant you four more minutes if you need it. Okay. Thank you. Appreciate that. First of all, nothing my friends have said takes away from the error in the first definition of abstract idea. I'm happy that they at least would agree to the second definition, but that second definition is wrong as well. All of the board's 101 determinations were based on incorrect claim constructions, as I discussed previously and detailed very clearly in our brief. Contrary to what they've said, the specification does not say that the claim features were well known. Windows CE didn't have synchronous menu generation and transmission as claimed. And Bill Gates and Microsoft lauded Amaranth's technology and invested in Amaranth specifically for that reason. That's in our briefs that was presented to the board. They refused to consider it without even a comment. Just to clarify, Windows CE had data syncing, but I guess your response is it didn't have data syncing for this particular kind of data. It didn't have data generation and transmission and making sure there was and providing a synchronous communication between the menu structures. It was the operating system for the handheld device that Amaranth was using at the time. And Amaranth, I don't know if they sought out Microsoft or Microsoft found out about them because of the trade show. I think that's probably what happened. Right. But Microsoft was very interested because this was such a good application for its handheld device. But they didn't do that. They provided the handheld operating system and the desktop operating system. Amaranth provides something that those could really be used for. But all Windows CE did was allow the handheld device to work. It didn't provide the software for doing what these claims say. So once again, the difference between what Amaranth provided and Windows CE with respect to synchronization. What's the difference? There's nothing about menus, restructuring, reconfiguring or transforming menus from a back office menu and transmitting it for display on a handheld device or web page. There's nothing in Windows CE, even today, directed to that functionality. At the time, there certainly was not. Under Windows CE, you could synchronize files from one device to another, correct? You can synchronize files, but you cannot synchronize menus, restaurant menus that are used. Wouldn't a menu ultimately be a file, a data file? A menu? No. A menu is not a simple file. It is data elements. But all those data elements are linked together by linkages. And that's why the hierarchical menu structure is very important. It's a specific hierarchical menu structure that gets transformed into another specific hierarchical menu structure. It's not just transforming data. It's changing one computerized structure into another computerized structure. Windows CE had and has today absolutely no capability to do anything of that nature. So let's assume for the moment my daughter sells Girl Scout cookies. And she's selling them out in front of the supermarket. And she's created a database somewhere. It has an inventory of a number of different categories of Girl Scout cookie boxes that she sells. And then as people come up and buy her boxes of cookies, she enters it into her little PDA. And because it's data synced with the database back at the home office CPU, we know she can keep track of the inventory, you know, that the number of boxes of each different kind of Girl Scout cookies is going down as she continues to sell more and more Girl Scout cookie boxes. Data syncing was known. She's using the known data syncing. But in your estimation, does she have an inventive concept? I don't know if she does or not. But that's irrelevant to this question because that's not what she's doing. It's not this claimed subject matter. This claimed subject matter is hierarchical structures, computerized structures, which are transformed into a different hierarchical structure for a specialized device. And the board's own constructions support that view, that displayability, or require that view. You don't want to try to answer my question? I am trying to answer your question. The question is, is there an inventive concept there in using data syncing in that way for keeping track of inventory? Today, I would have to say no, but I'm not an expert in the field. I haven't looked at that prior art. But data syncing is not inventive now, and data syncing was not inventive then. But we don't claim data syncing. We claim particular menu structures that are more than data. They are in a database, but they are linked together via relationships that are defined by code. The data elements are linked together, and then all that is transformed into some different structure that will work on a handheld device or a web page. That's not just data syncing. The board did not even consider our argument for inventive concept, because they made their conclusions based on incorrect link instructions, particularly menu. That's a detail in our brief, and I don't have a lot of time to get into it. But I refute what they say. Fursada involved organizing data. These claims are directed to much more than organizing data. In Fursada, it was more like your daughter's Girl Scout example without even transmitting anything. That's what they were doing there. This is very different. The board was required to consider objective evidence in its institutions and decisions, but it did not. It did not even comment. The rule states that a technological invention requires an inquiry into obviousness and novelty. The no-nexus argument that my friends made on the other side... I'm sorry, could you repeat that? The inquiry into whether something is a technological invention requires an inquiry into novelty and non-obviousness? Correct. The technological invention definition includes whether the patent claims are directed to something that is more than a non-novel and obvious invention. So how can one make that determination without considering obviousness? I guess non-obvious technical advance, right? Yes. If your advance is a particular way of selling cookies, that's not going to be enough to establish a technological invention. Correct, but we're technical as we explain in our briefs and we explain to the board, but they did not consider that at all. They also made an inquiry on whether your invention was a technical solution that solved a technical problem. Yes, and then we explain why we think the reasoning I've stated today and the reasoning in our papers before the board explain why the technical feature prong is satisfied for some of the same reasons that the technological invention prong is satisfied. With regard to nexus, that whole nexus argument that you heard from the other side was and from the PTO was argued for the first time on appeal. There was nothing, nothing before the PTAB concerning an absence of nexus. They didn't talk about it on the other side, secondary factors. The PTAB didn't talk about it at all. So the board never considered the proverb objective evidence and rebuttal evidence. Thus, nothing could have been washed clean. There was nothing there to wash clean. They didn't even consider it later on. So this idea that the ultimate determination under 101 is the same or includes the determination for standing is wrong because it was never looked at. Nothing was ever addressed later on on the technological invention prong, technological invention exception. So there was nothing to wash clean. There was no washing, simply no washing, clean or otherwise. Mr. Franklin, this characterized what I said before. I did not say that the manual modification subject matter was conventional. And I think the transcript will show that. I said that manual modification in the context of the generated hierarchical menus for particular displays was nonconventional. And that's what the board found, at least as regards menus. The board disagreed with some hierarchical menus, but that's been addressed separately. And the questioning from the court regarding Henry Hinecker, we agree with. Hinecker allows this court to review the standing determination. I'd like to say a little bit about the problem solved by the invention. I've hit on some of these points already. But prior to the invention, wireless handheld devices were not synchronized with back office menu systems. Menus were complex. They had linked levels. They had to be reentered separately on each handheld device. If you had a handheld device, let's say, in your restaurant that you wanted the waiter to use. Handhelds were different because of their smaller screens. Separate entry took hours of time and had to be done separately for every handheld device. So you actually had to physically enter in everything on however many computers you had that waiters were going to use. This was not done automatically or even in a few minutes. It took hours and hours. And whenever something changed in the back office menu, all the handhelds would be out of synchronization. Synchronization, meaning the menu was not the same on the handhelds as it was in the back office. That's the problem this invention sought to solve. By taking that back office menu, changing it, porting it out to devices, and displaying properly on them. The inventors recognized that problem. And the problem wasn't even recognized before. And then found the solution in what's claimed. What would you say is the objective or the desired result of the invention? That is to be the result. Is to provide menu displays on disparate devices, particularly claimed or handheld devices or web pages, which will be the same as the back office menu. So that a manager of a restaurant or a manager of a pizza company that sells pizzas online can make a change in the menu in the back office. And any consumer that wants to order a pizza will see the right menu at the time they pull up that menu. That's the objective and the result. And it was not known at all any time before. No evidence has been submitted that it was. You know, some statements about Windows CE or any other things they rely on or the board relied on as evidence of conventionality just don't support a conventionality determination of those claims. Do you want to conclude? Thank you, Your Honor, for your time. We would ask that you reverse the 1792 case and confirm the credibility of the claims in the 1703 case. Thank you. Thank you, Your Honor. We thank all counsel for their arguments this morning.